# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHAVON T. WALKER, | |
| Plaintiff, | |
| v. | Civil No. 15-00055 (CKK) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

## MEMORANDUM OPINION
(September 30, 2017)

Plaintiff, Shavon Walker, is a former employee of the District of Columbia Public Schools ("DCPS"), which is an agency of the Defendant, the District of Columbia (the "District" or "Defendant"). Plaintiff, who is African American, filed suit against Defendant, alleging that Defendant: (1) violated the District of Columbia Whistleblower Protection Act ("DC WPA"); (2) discriminated and retaliated against her on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); and (3) retaliated against her for engaging in activity protected under the Rehabilitation Act of 1972, 29 U. S.C. § 700 *et seq.* ("Rehabilitation Act"), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12100 *et seq.* Presently before the Court is Defendant's [54] Motion for Summary Judgment.

Upon consideration of the parties' submissions,[1] the relevant legal authorities, and the record as a whole, the Court finds that Plaintiff has raised a genuine issue of material fact as to her

---

[1] The Court's consideration has focused on the following documents and their attachments: Def.'s Mot. for Summ. Judg., ECF No. 54 ("Def.'s Mot.") and the Mem. of P & A in Support of Mot. ("Def.'s Mem."), ECF No. 54-3; Pl.'s Opp'n and Mem. of P & A in Opp'n to Def.'s Mot. (collectively, "Pl.'s Opp'n"), ECF No. 60; Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply"), ECF

claims under the Whistleblower Protection Act and for retaliation under Title VII, but not for racial discrimination or retaliation under the ADA or the Rehabilitation Act. Accordingly, the Court shall GRANT-IN-PART and DENY-IN-PART Defendant's [54] Motion for Summary Judgment. Specifically, the Court shall grant Defendant's Motion for Summary Judgment with regard to Plaintiff's racial discrimination claim pursuant to Title VII and her claim for retaliation under the ADA and the Rehabilitation Act, but shall deny Defendant's Motion for Summary Judgment with regard to Plaintiff's claim under the D.C. Whistleblower Protection Act and her claim for retaliation under Title VII.

## I. BACKGROUND

### A. Factual Background[2]

As a preliminary matter, this Court notes that in the Background section of Plaintiff's Opposition, Plaintiff notes that "[a]ll facts in this background statement are drawn from the District's statement of undisputed [facts] if those facts are indeed undisputed, and otherwise from Ms. Walker's accompanying statement of genuine issues and statement of countervailing facts," without providing any cites to either party's statement of material facts Pl.'s Opp'n at 11 n.1. Nor does Plaintiff's argument in her Opposition provide cites to the statement of material facts or

---

No. 63; Pl.'s Mot. to Compel, ECF No. 24; Jt. Report to the Court regarding status of Mot. to Compel, ECF No. 37.

[2] The Court shall refer to Defendant's Statement of Material Facts ("Def.'s Stmt."), ECF No. 54–4, or directly to the record, unless a statement is contradicted by the Plaintiff, in which case the Court may cite to Plaintiff's Statement of Genuine Issues and Countervailing Facts, ECF no. 60-1, ECF No. 60-1, which responds to Def.'s Stmt. ("Pl.'s Resp.") and proffers countervailing facts ("Pl.'s Countervailing Fact"). Defendant's response to Plaintiff's Statement of Genuine Issues and Countervailing Facts, which replies to Pl's Resp. ("Def.'s Reply") and to Pl's Countervailing Facts ("Def.'s Resp."), ECF No. 63-3, may also be cited, where appropriate.

to the record evidence in this case. Rather, Plaintiff's Opposition to the Motion contains several narrative discussions by the Plaintiff, which are immaterial to the resolution of issues in this Motion.[3]

Plaintiff's [60-1] Statement of Genuine Issues and Countervailing Facts is fifty-nine pages in length, and her response to the District's Statement No. 4 consists of numerous references to bates-stamped pages that were produced to the District but only provided in part to the Court as Exhibit D to Plaintiff's Opposition. Plaintiff's first countervailing "fact" (out of 178) is not a fact but a narrative that spans eight and one-half pages and includes numerous facts and citations to bates-stamped documents, many of which have not been produced as exhibits to the Plaintiff's Opposition and are therefore not part of the record available to this Court for purposes of determining Defendant's Motion.[4] Local Civil R 7(h)(1) permits the non-moving party to submit a statement of facts believed to be genuinely disputed, but those facts must be "**concise**" and shall include specific "references to the part of the record relied on" to support the statement. *See* LCvR 7(h)(1) (emphasis added). Plaintiff's lengthy chronology of events, presented as the first Countervailing Fact, does not comply with LCvR 7(h)(1) and is therefore stricken. The parties were warned in this Court's March 11, 2015 Scheduling and Procedures Order that "[t]he Court strictly adheres to the dictates of Local Rule 7(h)," that statements of fact must be "short and concise" and that "the Court may strike papers not in conformity" with its rules. Scheduling and Procedures Order, ECF No. 11.

---

[3] Defendant notes that Plaintiff has "not [] cite[d] to any specific statement that she either identified in her countervailing statement of facts or that was raised by the District in its statement of material undisputed facts" and therefore, "it appears that Plaintiff expects the District, as well as the Court, to sift through the voluminous facts she has raised to determine the relevance to or probative value of those facts to the issues before this Court." Def's Reply at 2.

[4] Exhibit D is a "representative sample" of Plaintiff's "written communications." Def.'s Stmt. ¶ 5.

Furthermore, as the District of Columbia Circuit has emphasized, "[Local Civil Rule 7(h)(1)] places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) (citing *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)). In the instant case, Plaintiff's Statement of Genuine Issues and Countervailing Facts is unhelpful to the Court in setting forth the required background as certain key facts relating to the timing and substance of Defendant's alleged retaliatory conduct are not contained therein, nor do Plaintiff and Defendant always effectively distinguish between events that took place while Plaintiff was at McKinley Technical High School ("McKinley") or at Shaw-Garnett Patterson Middle School ("Shaw"), or both, or cite to the correct portions of the record. Accordingly, contrary to its preferred practice, the Court shall in some instances cite directly to the exhibits on which the parties rely in their briefing rather than to their statements of material facts.

Plaintiff, who is African-American, was employed as a Special Education teacher at McKinley beginning in 2005. Def.'s Stmt. ¶ 1. In her capacity as a Special Education teacher, Plaintiff worked with high functioning autistic students. Def.'s Stmt. ¶ 2. At the beginning of the 2011-2012 school year, Plaintiff was transferred to Shaw as a continuing special education teacher. Def. Stmt. ¶ 10. Plaintiff was informed that the autism program at McKinley was changing and that Shaw needed a special education teacher. Def.'s Stmt. ¶¶ 9, 10, 11. At Shaw, Plaintiff was assigned to teach a self-contained class of intellectually disabled students. Def.'s Stmt. ¶ 13. She worked there until her employment was terminated on August 8, 2013. Def.'s Stmt. ¶ 42.

1. <u>Plaintiff's Time at McKinley</u>

During her time at McKinley, Plaintiff made complaints about the school's alleged failure to provide special education students with required services or accommodations that fulfilled their individualized education programs. Def.'s Reply ¶ 4. More specifically, Plaintiff raised complaints regarding: inappropriate class sizes and groupings of students; not being able to obtain resources, including textbooks and classroom materials, and the support needed to teach effectively; and inadequate working conditions, including operating out of a classroom in the girl's locker room adjacent to the school's theater. Def.'s Reply ¶¶ 4, 5. Plaintiff claimed that she was denied certain assistive technology devices, a white board and textbooks that she needed for her students. Def.'s Stmt. ¶ 23. Plaintiff admitted however that she did not know what [resources and support] other [teachers] requested or received at other schools. Def.'s Stmt. ¶ 53. In fact, when asked whether the services were being provided at other schools, Plaintiff testified that "[she couldn't] speak to that because [she] wasn't at those schools." Def.'s Stmt ¶ 52. Nor could Plaintiff speak to whether or not the purported lack of resources was due to budgetary constraints at the school. Def.'s Reply ¶ 30; *see* Def.'s Mot., Ex. 4 (Pl.'s April 4, 2016 Dep.) at 53:2-12.

Plaintiff also complained about not being able to participate in certain training programs. Def.'s Reply ¶ 6. Plaintiff testified that she believed there was a racial element to the decision regarding who would receive training. *See* Pl.'s Mot., Ex. A (Pl.'s Dec. 22, 2015 Dep. at 126:1-126:8, 131:1-132:10, 133:5-134:5, 134:21-136:5, 136:20-137:7.)[5] Plaintiff did not however know whether only one teacher received the training that she was allegedly denied, and she did

---

[5] Defendant's Exhibits are numbered while Plaintiff's exhibits are lettered.

not know whether other black teachers were trained. *See* Def's Mot., Exhibit 1 (Pl.'s Dec. 22, 2015 Dep.) at 121:12-123:14.[6] According to Plaintiff, "the only reason why [she knew the [white] teacher received the training] [was] because [she] had regular conversations with her." *See* Ex. A, Pl.'s Dep. at 125:11-20. Plaintiff's allegations that the denial of training was racially motivated is unsupported by Plaintiff's own statements, which are inconclusive as to who received training.

Similarly, Plaintiff noted "different patterns of treatment" with regard to teachers in the autism cluster program when the teachers attended meetings, but she was unable to identify the schools or teachers. Def.'s Stmt. ¶ 19. Nor did Plaintiff know the Individualized Education Program ("IEPs") of the students of the Caucasian teachers, and admittedly, all she knew was from what she saw at the meetings that took place and conversations she had with unidentified minority teachers. Def.'s Stmt. ¶ ¶ 20, 21. On November 17, 2010, at a meeting with Colleen Koval, the citywide head of DCPS's autism program, Ms. Koval threatened to have Plaintiff "written up." Ex. 1's Dep. at 60:4-60:22 (where Plaintiff states that Ms. Koval threatened to write her up for a "task [that] wasn't completed in an electronic database"); Def.'s Mot., Ex. 2 (May 16, 2014 Amended Charge of Discrimination) at 1. On November 23, 2010, Plaintiff received a written reprimand by McKinley's Principal, David Pinder. Def.'s Reply ¶ 3; Def.'s Stmt. ¶ 33; Ex. 1 at 60:4-9. When asked whether the reprimand was the result of her raising concerns about lack of resources, Plaintiff testified that "I don't know why [Ms. Koval] - I can't speak to why it was influenced, I just know that it happened." Ex. 1 at 62:3-15. Plaintiff does not assert that this reprimand had any effect on her employment or otherwise.

---

[6] Def.'s Ex. 1 and Pl.'s Ex. A are both excerpts from Plaintiff's December 22, 2015 deposition.

In September 2011, Plaintiff was transferred to Shaw.  Def.'s Stmt. ¶ 10.  According to Mr. Pinder, Ms. Koval recommended that Ms. Walker's transfer from McKinley to Shaw because Shaw needed Ms. Walker's skill with autistic students.  Pl.'s Stmt. ¶ 19.  Plaintiff admits that "she was told that they needed additional support at Shaw Middle School, [t]hey needed to reallocate funds at the time, they didn't have a special education teacher who could oversee . . .students with . . . an intellectual disability at Shaw Middle School and so they needed someone to cover the classroom."  Def.'s Stmt. ¶ 11.

### 2. Plaintiff's Time at Shaw

At Shaw, Plaintiff was assigned to teach intellectually disabled students as opposed to working with students in the autism program.  Def.'s Stmt. ¶ 13.  Plaintiff's transfer to Shaw did not affect her teacher licensing.  Def.'s Stmt. ¶ 55.  Plaintiff ended up also taking extra students from another class and these students presented different disabilities from her intellectually disabled students.  Def.'s Stmt. ¶ 12; Pl.'s Stmt. ¶ 27.  Plaintiff concludes that she was given additional work in relation to a non-minority teacher.

After her transfer to Shaw, Plaintiff continued to make complaints about the lack of resources available to implement the requirements of her students' IEPs.  Def.'s Stmt. ¶ 14. Plaintiff indicated that "[d]uring the 2011-12 and 2012-13 school years at Shaw Middle School, resources, teaching caseloads and training opportunities were allocated unequally between white and minority teachers."  *See* Def.'s Mot., Ex. 5 (Pl.'s Answers and Objections to Interrogatories), Answer to Interrogatory 4.  Plaintiff contends further that she made a protected disclosure by joining in a grievance with several other Shaw teachers concerning school safety and proper discipline.  Def.'s Stmt. ¶ 17.

At a February 15, 2012 IEP review meeting, Plaintiff informed a student's parent and attorney that the student was not receiving appropriate IEP services. Pl.'s Stmt. ¶ 3. On March 12, 2012, the Shaw Assistant Principal told Plaintiff that teachers could "not share any new IEP information with the [student's] attorney prior to the meeting." Pl.'s Stmt. ¶ 4; Pl.'s Opp'n, Ex. K (Mar. 12, 2012 e-mail from Shaw Assistant Principal DeMatthews to Plaintiff). In a May 27, 2012 e-mail to Mr. DeMatthews, Plaintiff asserted that "information about [her] classroom and [her] students' progress as it pertains to [her] classroom should be topics [she] can freely discuss." *See* Pl.'s Opp'n, Ex. L (5/27/2012 e-mail from Shavon Walker to David DeMatthews). Plaintiff testified that [sometime] after the IEP meeting, she noticed that her "evaluations [went] down significantly," and she was subject to "constant micromanaging" and put on a "leave restriction," and she was told to "follow a certain protocol if [she] wanted to take leave." *See* Pl.'s Opp'n, Ex. B (Pl.'s Apr. 4, 2016 Dep.) at 65:14-68:1.

On June 13, 2012, Plaintiff received a poor performance review, which she alleged was inconsistent with two other evaluations provided to her by the Special Education Master Educators at the Central District Office. Def.'s Stmt. ¶ 32; Pl.'s Stmt. ¶ 7; Ex. A at 107:1-108:4. Plaintiff's low evaluation placed a "step hold" on her pay. Pl.'s Stmt. ¶ 9.

During the 2012-2013 school year, Plaintiff filed five complaints with the Labor Management and Employee Relations Division ("LMER") of DCPS, dated: October 11, 2012; December 7, 2012; February 15, 2013; April 10, 2013; and May 20, 2013. Pl.'s Stmt. ¶ 21. During that school year, Plaintiff was alleged to have fraudulently completed an IEP for a student and submitted it as a finalized documents in EasyIEP, the IEP management system. Def.'s Stmt. ¶ 35. An investigation was initiated into the complaint about Plaintiff's alleged fraudulent activity. Def.'s Stmt. ¶ 37. Because Shaw was closing at the end of the 2012-2013

school year, all staff had to secure new employment elsewhere.  Def.'s Stmt. ¶ 38.  Plaintiff

secured an offer of employment from Ludlow-Taylor Elementary School for the 2013-2014

school year.  Def.'s Stmt. ¶ 39; *see* Ex. 5, Answer to Interrogatory No. 10; Pl.'s Opp'n, Ex. H

(Details of Plaintiff's July 4, 2013 offer of employment from Ludlow-Taylor Elementary

School).  After the investigation was completed, a review board decided to terminate Plaintiff's

employment with DCPS, effective August 8, 2013, before she commenced employment at

Ludlow-Taylor Elementary School.  Def.'s Stmt. ¶¶ 41, 42.

### B.  Procedural History

On or about June 19, 2012, Plaintiff filed a Charge of Discrimination ("Charge") with the

Equal Employment Opportunity Commission ("EEOC").  Def.'s Stmt. ¶ 44; Def.'s Mot., Ex. 8

(June 19, 2012 Charge of Discrimination).  In that Charge, Plaintiff identified the following

grievances from November 17, 2010 through June 13, 2012:

a. On September 2, 2011, Plaintiff was involuntarily transferred to Shaw Middle School   as a

Special Education Teacher- Autism.

b. On November 17, 2010, Colleen Koval, the Special Education Autism Program Manager (PM)

for DC Public Schools (White), told her in a staff meeting, in front of her   peers, that she was

going to be written up.

c. On November 23, 2010, Plaintiff received a written reprimand.

d. In August 2011, she was denied her request for school resources she needed.

e. On April 10, 2012, she was placed on an unwarranted leave restriction.

f. On April 25, 2012, she was given a letter of reprimand.

g. On or about June 13, 2012, she was given a poor performance review which was inconsistent

with two other evaluations provided by the Special Education Masters

Educators at the Central District Office.

Def.'s Stmt. ¶ 45.[7]

On or about May 16, 2014, Plaintiff amended her EEOC Charge of Discrimination.
Def.'s ¶ 46; Ex. 2. In that Amended Charge, Plaintiff identified the following additional acts of alleged racial discrimination from October 2012 through December 2012:

a. [I]nequitable distribution of workloads, resources, and access to professional    development opportunities among the races.

Plaintiff also identified additional acts of racial discrimination as follows:

b. During the period February 2013 through August 2013, she participated in an    unexpected investigation regarding a[n] [alleged] fraudulent IEP, and that the    documentation regarding the investigation became part of her personnel file.

c. She received a low performance evaluation score because of the lack of direction provided to her on future tasks.

Plaintiff identified additional acts of retaliation as follows:

d. In April 2013, she was suspended with no pay re: "negligence and dereliction of duties."

e.. In April & May 2013, she was not paid for all medical leave taken despite providing medical notes.

f. In July 2013, she received a letter stating that her overall performance evaluation for    the entire school year is not within an acceptable range to receive a pay increase.

g. In January 2014, her administrative appeal to the Chancellor regarding her    performance evaluation scores was denied.

h. In March 2013, she was suspended for three days.

---

[7] Def.'s Stmt. ¶ 45, which is admitted by Plaintiff, summarizes the EEOC grievances.

i. The IMPACT process was violated when her performance was not properly rated.

j. On August 8, 2013, she was notified that her employment was terminated.

Def.'s Stmt. ¶ 47; Pl.'s Resp. ¶ 47.[8]

Plaintiff filed a lawsuit in the Superior Court of the District of Columbia on December 15, 2014. ECF No. 1-1. On January 14, 2015, this case was removed to this Court from the Superior Court of the District of Columbia. Plaintiff's Complaint alleges one count in violation of the DC WPA, one count of racial discrimination and retaliation, in violation of Title VII, and one count of retaliation for engaging in protected activity under the Rehabilitation Act and the ADA. *See* Amended Compl., ECF No. 1-1.

While discovery was pending in this case, Plaintiff filed a motion to compel against the District on November 6, 2016, wherein she identified all the discovery produced by the District on which she requested court intervention.[9] *See* Pl.'s Mot. to Compel, ECF No. 24 (requesting information regarding training opportunities and support and benefits available to Plaintiff and to comparable DCPS employees in Interrogatories Nos. 5-7). The motion to compel was referred to Magistrate Judge G. Michael Harvey, who set a December 9, 2015 status hearing on the motion. On December 10, 2015, Magistrate Judge Harvey directed the parties to file a "joint notice with the Court, . . . articulating what, if any, issues raised in plaintiff's Motion to Compel [Dkt. 24] remain following the defendants' submission of amended responses to plaintiff's documents requests and its recent production to plaintiff of additional materials after entry of the protective order." *See* December 10, 2015 Minute Order.

---

[8] Defendant again summarizes the claims in the Amended EEOC charge.

[9] The Court includes a discussion about the Plaintiff's motion to compel because it is relevant to Plaintiff's claim for racial discrimination.

On January 27, 2016, the parties filed a Joint Report regarding the status of the motion to compel, which indicated that Interrogatory No. 7 had been resolved but Interrogatories No. 5 and No. 6 were still unresolved or only partially resolved. The District claimed that it had "fully answered the interrogatories [5 and 6] as revised by Ms. Walker" and asserted that while Plaintiff alleged that answers were deficient, she had not demonstrated any deficiency. *See* Joint Report to the Court regarding the Status of the Motion to Compel, ECF No. 37, at 6. Accordingly, Magistrate Judge Harvey set a February 16, 2016 hearing on the remaining issues identified in the parties' Joint Report.

In a Minute Order following the February 16, 2016 hearing, Magistrate Judge Harvey stated that "[b]y agreement of the parties reached at the hearing, defendant [was to] provide amended responses to a revised version of plaintiff's interrogatories 5 and 6 on or before February 23, 2016, which, if defendant complies, plaintiff agrees will resolve her motion with respect to those two interrogatories as well." February 16, 2016 Minute Order. Magistrate Judge Harvey further noted that once defendant had provided amended responses to interrogatories 4, 5, and 6, and document request 31, "plaintiff agrees that all issues raised in her motion to compel will be resolved with the exception of her request that defendant pay plaintiff's legal fees and expenses incurred in bringing the motion." *Id.* Plaintiff did not raise any issues about any contested discovery thereafter, even at the time she filed her motion for fees, which was granted in part in a [46, 47] Memorandum Opinion and Order.

On July 1, 2016, this Court issued an Order finding that the parties had resolved all discovery-related issues, including those concerning "Defendant's answers to Plaintiff's interrogatories," and Plaintiff made no objection to that Order. *See* July 1, 2016 Order, ECF No. 46. Nor did Plaintiff indicate there was any outstanding contested discovery when the parties

appeared before the Court, on September 8, 2016, to set a briefing schedule for dispositive motions. *See* September 8, 2016 Minute Order.

After the close of discovery, Defendant filed its Motion for Summary Judgment, which is now fully briefed and ripe for resolution. *See* Def.'s Mot.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly

address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor. *Liberty Lobby, Inc.*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251-52. In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby, Inc.*, 477 U.S. at 249-50 (internal citations omitted).

In recognition of the difficulty in uncovering clear evidence of discriminatory or retaliatory intent, the district court should approach summary judgment in an action for employment discrimination or retaliation with "special caution." *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*). Be that as it may, the plaintiff is not relieved of her burden to support her allegations with competent evidence. *Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009). As in any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, then at the summary judgment stage she bears the burden of production to designate specific facts

showing that there exists a genuine dispute requiring trial. *Ricci v. DeStefano*, 557 U.S. 557 (2009). Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary judgment device—namely, "to weed out those cases insufficiently meritorious to warrant . . . trial"—simply by way of offering conclusory allegations, speculation, and argument. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## III. DISCUSSION

### A. Plaintiff's Claims of Racial Discrimination Pursuant to Title VII

Title VII of the Civil Rights Act makes it unlawful for any employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Where there is no direct evidence of discrimination, Title VII claims are assessed pursuant to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). Plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. To allege a *prima facie* case of discrimination, a plaintiff must show that she "is a member of a protected class," that she "suffered an adverse employment action," and that "the unfavorable action gives rise to an inference of discrimination." *Youssef v. F.B.I.*, 687 F.3d 397, 401 (D.C. Cir. 2012) (quoting *Stella v. Mineta,* 284 F.3d 135, 145 (D.C. Cir. 2002)).

Once the plaintiff has made a *prima facie* case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the [employment action that is challenged].'" *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *McDonnell Douglas*, 411 U.S. at 802). Once an employer has proffered a nondiscriminatory reason, the

*McDonnell Douglas* burden-shifting framework disappears, and the court is left to determine whether the plaintiff has put forth enough evidence to defeat the defendant's proffer and support a finding of discrimination. *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008); *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007).

At the summary judgment stage, courts may consider plaintiff's *prima facie* case, evidence presented by the plaintiff to rebut the employer's explanations for actions taken, and any additional evidence of discrimination that the plaintiff might proffer. *See Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012); *see Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (noting that, to avoid summary judgment, a plaintiff need not submit evidence "over and above" that necessary to rebut the employer's stated reason) (quotation omitted). A plaintiff's disagreement with or disbelief in employer's explanation cannot alone "satisfy the burden of showing that a reasonable jury could find that the employer's asserted reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Burton v. District of Columbia*, 153 F. Supp. 3d 13, 58 (D.D.C. 2015).

In the instant case, there is no dispute that Plaintiff, who is African American, meets the first requirement of her *prima facie* case because she is a member of a protected class.

With regard to the second requirement, plaintiff must demonstrate that she suffered an adverse action. *See Evans v. Sebelius,* 716 F.3d 617, 619 (D.C. Cir. 2013) (noting that an adverse action is a prerequisite for a Title VII claim) (citing *Stewart v. Ashcroft,* 352 F.3d 422, 426 (D.C. Cir. 2003)); *Patterson v. Johnson,* 505 F.3d 1296, 1298 (D.C. Cir. 2007) ("Liability for discrimination under Title VII requires an adverse employment action.") (citing *Brown v. Brody,* 199 F.3d 446, 452–55 (D.C. Cir. 1999)). For purposes of Title VII discrimination claims, "[a]n 'adverse employment action' is 'a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Douglas v. Donovan,* 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Taylor v. Small,* 350 F.3d 1286, 1293 (D.C. Cir. 2003)). "An employee must 'experience[ ] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Id.* (quoting *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002)). The D.C. Circuit has cautioned that "not everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi,* 257 F.3d 815, 818 (D.C. Cir. 2001). Indeed, in this respect, "courts are not 'super-personnel department[s] that reexamine[ ] an entity's business decision[s].'" *Stewart,* 352 F.3d at 429 (quoting *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir. 1986)).

1. Sorting out Plaintiff's Claims of Discrimination

Plaintiff's Amended Charge of Discrimination highlights two acts of discrimination – one relating to inequitable distribution of workloads, resources, and access to professional development opportunities and the other relating to the investigation into a "fraudulent IEP." *See* Ex. 2. Plaintiff's Amended Complaint addresses discrimination on the basis of race in Count Two but does little to enlighten this Court as it incorporates by reference Paragraphs 1-25, and only Paragraph 14 specifically addresses an alleged racial disparity regarding denial of supports and benefits, including training, materials, workspaces and division of responsibilities. *See generally* Amended Compl. In her Opposition, Plaintiff alleges that Defendant discriminated against her on the basis of race in "two respects," first, by withholding of resources and supports, and second by assigning Plaintiff "a disproportionately difficult case load at Shaw relative to the white special

education teacher." Pl.'s Opp'n at 50.[10] Plaintiff does not assert that there was racial discrimination regarding the investigation into the alleged fraudulent IEP, and accordingly, that issue has been conceded by Plaintiff. "It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v Women's Div. Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)); *Stephenson v. Cox*, 223 F. Supp.2d 119, 121 (D.D.C. 2002), *aff'd*, 98 Fed. Appx. 8 (D.C. Cir. 2004). Accordingly, the Court will review Plaintiff's claim for discrimination as set forth in her Opposition.

Plaintiff claims that "Ms. Koval forced out minority autism program teachers, including by making their work lives difficult by withholding necessary resources and supports." Pl.'s Opp'n at 50. Plaintiff contends that she has "propounded discovery designed [to] elicit information that would show that minority and non-minority teachers within the autism program were supported in disparate fashion during Ms. Koval's tenure [but] [t]o date, despite promises to provide the requested information, the District has never produced it." Pl.'s Opp'n at 12. Plaintiff suggests that this alleged non-production of discovery makes it "premature" for the Court to "even consider [this] question." Pl.'s Opp'n at 50. The Court notes that the deadline for completion of discovery in this case was April 18, 2016. *See* March 18, 2016 Order, ECF No. 44.

In light of the record in this case, the Court finds that Plaintiff has waived any argument related to the insufficiency of the District's discovery responses because she repeatedly failed to raise this issue when she was before this Court, instead waiting to raise it in her opposition to the

---

[10] In citing the pleadings, the Court references the page number assigned by the Electronic Cases Filing system.

pending Motion. Furthermore, while Plaintiff references Fed. R. Civ. P. 56(d) and (e) in her Opposition, the Court notes that she provides no affidavit as required by Rule 56(d), and thus, any request under Rule 56(d) should be denied. *See Convertino v. U.S. Dept. of Justice*, 684 F.3d 93, 99-100 (D.C. Cir. 2012) (explaining that a Rule 56(d) affidavit must outline the particular facts the movant intends to discover and describe why such facts are necessary, explain why the facts could not be produced in opposition to summary judgment, and show that the information is discoverable). Accordingly, the Court rejects Plaintiff's suggestion that it is premature to consider Plaintiff's claim of racial discrimination based on the factual predicate set forth above.

Plaintiff claims that she "was assigned a disproportionately difficult caseload at Shaw relative to the white special education teacher," and this constitutes disparate treatment. Pl.'s Opp'n, at 50. Plaintiff asserts that she was "expected to teach several students, not intellectually disabled, who were transferred into her class for reading instruction from the class of the Caucasian special education teacher" and she "asked for training to help her teach her students, but only the white special education teacher received training, leading her to believe that there was a racial element to the training and caseload distribution decisions." Pl.'s Opp'n at 14-15. The Court now turns to whether Plaintiff has met the second requirement for establishing a *prima facie* case for race based discrimination.

a. Does Plaintiff Establish an Adverse Employment Action?

It is well-established that an adverse employment action must involve "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). The Supreme Court in *Burlington Northern* provided an objective standard for what constitutes an "adverse employment action,"

19

first explaining that such action must be material, not trivial and second, adopting a flexible standard because retaliation often depends upon the context, *i.e.*, the particular circumstances. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). *See also Niskey v. Kelly*, 859 F.3d 1, 8 (D.C. Cir. 2017) ("Prohibited discrimination . . . is not rigidly confined to 'hirings, firings promotions, or other discrete incidents.'") (quoting *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006)). What is necessary to establish an adverse action is that the employee "experience materially adverse consequences <u>affecting the terms, conditions, or privileges of employment or future employment opportunities</u> such that a reasonable trier of fact could find objectively tangible harm." *Douglas*, 559 F.3d at 552 (internal quotations omitted) (emphasis added).

In the instant case, Plaintiff's claim of denial of training opportunities does not constitute an adverse employment action with regard to her claim for racial discrimination. Plaintiff provides no details about the type of training she was presumably denied or whether the lack of any such training would have materially affected her employment. When alleging discrimination, denial of a training opportunity can constitute an adverse employment action, "but only if the denial materially affects the plaintiff's pay, hours, job title, responsibilities, promotional opportunities, and the like." *Santa Cruz v. Snow*, 402 F. Supp. 2d 113, 127 (D.D.C. 2005); s*ee also Edwards v. EPA,* 456 F. Supp. 2d 72, 86 (D.D.C. 2006) ("[T]o be adverse, the denial of a travel or training opportunity must have a discernible, as opposed to a speculative, effect on the terms, conditions, or privileges of one's employment.") Plaintiff proffers no evidence in support of her claim that denial of training had any discernible effect on the terms or conditions of her employment. Therefore, there are no facts to support an adverse action for purposes of proving her *prima facie* case.

Similarly, Plaintiff's claim that she was not allocated certain resources does not rise to the level of an adverse employment action, as "such common workplace shortfalls, without more, are not the kinds of problems that Title VII was intended to remedy." *Casey v. Mabus*, 878 F. Supp. 2d 175, 185 (D.D.C. 2012); *see Allen v. Napolitano*, 774 F. Supp. 2d 186, 203 (D.D.C. 2016) (finding that a denial of additional resources and support does not qualify as a material adverse action where plaintiff "could have benefitted" from them). A lack of resources and increased workloads are "familiar complaints in virtually every workplace and every industry, but they do not give rise to a discrimination claim under Title VII." *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 73 (D.D.C. 2007); *see also Clegg v. Ark. Dept. of Corr.*, 496 F.3d 922, 929 (8th Cir. 2007) (finding that a denial of access to needed employment tools and denial of training did not meet the standard for establishing an adverse employment action).

Nor does Plaintiff's claim that her workload was disproportionate to that of the Caucasian teacher rise to the level of an adverse employment action for purposes of pursuing a racial discrimination claim under Title VII, as she has set out no facts to support that the distribution of work was racially motivated. "Changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes." *Mungin v Katten Muchin & Zavis*, 116 F. 3d 1549, 1556-57 (D.C. Cir. 1997); *see also Bowdin v. Clough*, 658 F. Supp. 2d 61, 82 (D.D.C. 2009) (finding that plaintiff did not state a claim for discrimination based on being "given extra tasks" in relation to his female counterparts in part because "the tasks among all [co-workers] vary according to their skill and experience"); *Rattigan*, 503 F. Supp. 2d at 73.

In this particular case, any assignment of extra work fails to rise to level of a materially adverse employment action because such action constitutes a "petty slight[ ] or minor

annoyance[ ] that often take[s] place at work and that all employees experience." *AuBuchon v. Geithner*, 743 F.3d 638, 645 (8th Cir. 2014) (quoting *Burlington N.*, 548 U.S. at 68). Accordingly, the Court concludes that Plaintiff has failed to demonstrate the existence of any materially adverse employment action in support of her claim for racial discrimination, and thus, she has not made a *prima facie* case.

b. Discriminatory Intent

Even assuming *arguendo* that Plaintiff's disproportionate workload and lack of training could be construed as adverse actions, Plaintiff would still need to demonstrate that this was motivated by a discriminatory intent. In her Opposition, Plaintiff points to nothing in the record before this Court to support an allegation of discriminatory intent. In her deposition, Plaintiff testified that, while at Shaw, she was "asked to absorb the caseload" of a non-minority teacher for reading instruction. Pl.'s Countervailing Fact ¶ 26; Ex. A at 115:18-117:8. The students sent to Plaintiff's classroom came from an inclusion class, while her students were self-contained, and they presented different disabilities from her intellectually disabled students. Pl.'s Countervailing Fact ¶ 27; Ex. A at 117:1-14. Plaintiff testified that she "had to get very creative with how [she] was going to structure [her] program in order to provide effective instruction." Ex. A at 120:17-121:11. Plaintiff testified that she had five of her own students, who had intellectual disabilities, and this number increased to approximately eleven students when the additional students came in for reading instruction. Ex. A at 117:20-117:22; 119:3-18. Plaintiff testified that she was "helping out this . . . Caucasian teacher with her caseload," although that teacher could have taught because she had time in her schedule. Ex. A at 119:19-120:5. Plaintiff knew that the kids had "very challenging behavior" and "since [she] typically tend[s] to be good with classroom management, [she] kn[e]w that's why they actually asked [her] to help because

[the other teacher] wasn't effective in that area" and it was "no big deal, fine, send them on over, they will be with her for the rest of the time." Ex. A at 120:6-120:12. Plaintiff opined that the different levels impeded her ability to teach effectively. Pl's Countervailing Fact ¶ 28; Def.'s Resp. ¶ 28; Ex. A at 120:17-121:11.

Plaintiff asserted therefore that she asked to be trained to help her students but only the white teacher received training, which led her to conclude that there was a racial element to the decision. Pl.'s Countervailing Fact ¶ 29; Def.'s Resp. ¶ 29. Plaintiff's statement is unsupported by her deposition testimony that she did not know whether the teacher referenced was the only teacher who received training or whether other black teachers were trained. *See* Ex. 1 at 122:1-123:19; *see also* Ex. A at 125:11-20 (where Plaintiff testified that the only reason she knew that the Ms. Baker [Caucasian] had received training was because she had conversations with her). Plaintiff relies on her own opinions and fails to cite to any competent evidence to support her claim that any denial of training or additional work that she was given was motivated by any discriminatory intent or is in any way linked to her race.

Similarly, assuming that Plaintiff's denial of resources could be construed as an adverse action, in her Opposition, Plaintiff points to nothing that supports her claim that minority autism-teachers were denied resources and supports that were provided to non-minority autism teachers. Plaintiff testified that the basis of her race complaint is that she "saw the patterns of treatment with different teachers throughout the autism cluster program when we attended the meetings" but she could not identify any of the schools or teachers. Ex. 1 at 32:2-9; Def.'s Stmt ¶ 19. Plaintiff further testified that all she knew was what she saw from the meetings and her conversations with minority teachers but provided only a conclusory assertion with no details. Def.'s Stmt. ¶ 21; Ex. 1 at 43:8-20. Plaintiff conceded that she did not know about the IEPs of

the white teachers so she could not speak to whether their resources matched their IEP needs. Ex. 1 at 43:8-20; Def.'s Stmt. ¶ 20. Conclusory statements made by a Plaintiff that are unsubstantiated by facts in the record "come within an exception to [the] rule" that "statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion." *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) "Absent supporting facts—and [Plaintiff] provided none—a jury would be in no position to assess her claim . . . . Accepting such conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Id.*

Plaintiff testified that before Ms. Koval came to McKinley in 2010, Plaintiff would request resources through Ms. Vicki who was able to get her resources "as much as possible but once she left that's when resources were not provided in either direction, school or the autism cluster program." Ex. 1 at 29:19-30:14. Plaintiff did not ask Ms. Vicki for everything but relied on some things to be fulfilled by the principal. Ex.1 at 31:20-32:1. Plaintiff was "under the impression that [her] school was supposed to also include [her] on the budget." Ex. 1 at 31:4-19. Plaintiff did not know how money was divided up in the school budget nor did she know how her program was funded. Ex. 4 at 53:2-126; Ex. 1 at 29:16-18. Plaintiff has failed to demonstrate that a trier of fact could infer that any denial of resources was motivated by any discriminatory intent or is in any way linked to her race. Accordingly, because Plaintiff has not demonstrated any discriminatory intent with regard to her claim of racial discrimination, summary judgment should be granted in favor of Defendant on this claim.

**B. Plaintiff's Retaliation Claims**

Plaintiff makes claims for retaliation pursuant to Title VII, the ADA, and the Rehabilitation Act.[11]  More specifically, Plaintiff claims that she was subject to retaliation under Title VII for protesting against the alleged disparate and adverse treatment she was accorded because of her race, and for advocating on behalf of persons with disabilities, which is a legally protected activity under the Rehabilitation Act and the ADA.  The Court notes that Plaintiff's briefing on her retaliation claims in her Opposition is deficient insofar as it incorporates by reference her argument regarding her Whistleblower claims, thereby leaving the Court to try to divine and piece together Plaintiff's protected activities with any materially adverse actions she relies upon in order to prove her *prima facie* case.[12]

1. Retaliation under Title VII

Title VII contains an anti-retaliation provision that makes it unlawful for an employer to "discriminate against any of his employees or applicants for employment. . . because he has opposed any practice made an unlawful employment practice by this subchapter or because he has made a charge, testified, assisted, or participated in any manner in an investigation,

---

[11] A retaliation claim is independent of a discrimination claim insofar as an employee may bring a retaliation claim even when the underlying discrimination claim is unsuccessful.  *Childers v. Slater*, 44 F. Supp. 2d 8, 23 (D.D.C. 1999).

[12] More specifically, Plaintiff contends that "[b]ecause the analysis of the harms Ms. Walker sustained in response to her protected civil rights activities overlaps the discussion [ ] with respect to the DCWPA, [ ] we therefore will not repeat [that analysis]."  Pl.'s Opp'n at 45. Unfortunately, the Plaintiff's Whistleblower claim analysis does not clearly and concisely tie her claimed protected activity to specific adverse actions that have been alleged nor does it contain citations to the record before this Court.

proceeding, or hearing under this subchapter. 42 U.S.C. § 20003-3(a). To prevail on a claim of unlawful retaliation under Title VII, "the plaintiff must allege that she engaged in activity protected by Title VII, the employer took adverse action against her, and the employer took that action because of the employee's protected conduct." *Walker v. Johnson*, 798 F. 3d 1085, 1091-92 (D.C. Cir. 2015) (citing *Hamilton*, 666 F.3d at 1357).

Similar to discrimination claims under Title VII, where allegations of retaliation are not based on direct evidence, as here, the Court must follow the aforementioned *McDonnell Douglas* burden-shifting framework, with plaintiff first carrying the burden of demonstrating her *prima facie* case. "To establish a *prima facie* case of retaliation based on circumstantial evidence, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal link connects the two." *Doak v. Johnson*, 798 F.3d 1096, 1107 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Solomon v. Vilsack*, 763 F.3d 1, 14 (D.C. Cir. 2014)). If, after the plaintiff proves her *prima facie* case, the defendant proffers a legitimate, nondiscriminatory reason for its challenged action, summary judgment in favor of defendant is appropriate if the employee fails to rebut defendant's reason. *See Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2013) (noting that "the 'central question' in [the] case is whether [the plaintiff] has produced sufficient evidence for a reasonable jury to find those reasons were but pretexts for retaliation.") (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012))).

a. Protected Activities

Plaintiff asserts that she filed five EEO complaints with LMER during the 2012-2013 school year, in which she alleged, *inter alia*, racial and differential treatment discrimination. Pl.'s Countervailing Fact ¶ 21; Ex. N, Deposition of Erin Kimberly Pitts, Depo. Ex. DC 12. "It is

well-settled that Title VII protects informal, as well as formal, complaints of discrimination." *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007); *see generally Woodruff*, 482 F.3d 521 (filing an EEOC complaint is a protected activity). Defendant concedes that Plaintiff's EEO grievances are protected activities. *See* Def.'s Mot. at 13 n.1 ("[N]or does [the District] argue that Plaintiff's grievances are not protected activities."). Accordingly, for purposes of a claim for retaliation under Title VII, Plaintiff has satisfied the requirement of engaging in a protected activity.

      b. <u>Adverse Actions</u>

Adverse actions within the context of a retaliation claim encompass a "broader sweep of actions" than in the context of a discrimination claim. *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008); s*ee also Pardo-Kronemann v. Donovan*, 601 F.3d 599, 615 (D.C. Cir. 2010) ("The question of the 'adversity' required for an 'action' to be retaliatory naturally depends on objective differences between the conditions before and after the [challenged action]."). With regard to retaliation claims, actionable adverse actions are "not limited to discriminatory actions that affect the terms and conditions of employment" but instead may extend to harms that are not workplace-related or employment-related so long as "a reasonable employee would have found the challenged action materially adverse." *Burlington N.*, 548 U.S. at 64, 68. "In the retaliation context, instead of requiring a significant change in employment status to constitute adversity, an action is adverse if it would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Crowley v. Vilsack*, 236 F. Supp. 3d 326 (D.D.C. 2017) (quoting *Burlington N.*, 548 U.S. at 68).

<u>Review of the Possible Adverse Actions in this Case</u>

As previously noted, Plaintiff has not set forth the adverse action(s) that allegedly support her retaliation claims, thus, leaving it to this Court to flesh out which materially adverse action could have resulted from her claimed protected activity, in terms of the timing of both. The Court begins it analysis of materially adverse actions that might apply with regard to Plaintiff's retaliation claims by examining the adverse actions that are conceded and contested by the Defendant. First, the District concedes that Plaintiff's termination was an adverse action and that a suspension from work without pay is an adverse action. Def.'s Mot. at 13 n.1. The District argues that the following actions are not adverse actions: (1) Plaintiff's transfer from McKinley to Shaw in September 2011; (2) reprimands, including the November 17, 2010 threat of a write-up by Ms. Koval and the November 23, 2010 reprimand by Mr. Pinder, as well as the April 10, 2012 leave restriction and the April 25, 2012 reprimand; (3) the claim that during the period October 2012 through December 2012, Plaintiff experienced "inequitable distribution of workloads, resources, and access to professional development opportunities among the races"; (4) receipt of low performance evaluation scores; and (5) being subject to an investigation regarding a fraudulent IEP.[13]  Upon a review of the record in this case and the applicable case law, the Court makes the following findings about each of these alleged "adverse actions."

<u>Plaintiff's Transfer from McKinley to Shaw</u>

Plaintiff was hired in 2005 as a special education teacher. Def.'s Stmt ¶ 1. When she was transferred to Shaw, she continued as a special education teacher, albeit in a different school with children with different special education needs. Def's Stmt. ¶¶ 2, 10, 13. "Whether a

---

[13] Whether the fraudulent IEP investigation is an adverse action will be considered in the context of Plaintiff's claim for retaliation under Title VII, under the subheading c. <u>Investigation and Termination</u>.

particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington N.*, 548 U.S. at 71 (citing *Oncale v. Sunflower Offshore Serv., Inc.*, 523 U.S. 75, 81 (1998)). Here, Plaintiff's transfer from McKinley to Shaw entailed a change from being a special education teacher who taught autistic children to being a special education teacher who taught intellectually disabled children.

Plaintiff claims that she was "forced to take on heavier work responsibilities" but being asked to handle heavier work responsibilities does not necessarily imply an adverse action. *See generally Morales v. Gotbaum*, 42 F. Supp. 3d 175, 197-200 (D.D.C. 2014). As previously noted, Plaintiff admits that "she was told that they needed additional support at Shaw Middle School, [t]]hey needed to reallocate funds at the time, they didn't have a special education teacher who could oversee . . . students with . . . an intellectual disability at Shaw Middle School and so they needed someone to cover the classroom." Def.'s Stmt. ¶ 11; 54. Moreover, Plaintiff's previously cited testimony indicates that she felt that because she had good classroom management skills, they asked her to help out another less experienced teacher by taking on extra work. Ex. A at 120:2-120:12.

Accordingly, Plaintiff's transfer from McKinley to Shaw does not constitute a materially adverse action. "While a transfer can be 'adverse' if the new position requires 'significantly different responsibilities,'" here, Plaintiff's position at Shaw required the same or similar responsibilities as her position at McKinley. *Hernandez v. Gutierrez*, 850 F. Supp. 2d 117, 122 (D.D.C. 2012) (citing *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006)) (internal citation omitted).

<u>November 2010 Threat of a Write-up, Written Reprimand, and April 2012 Actions</u>

Plaintiff's deposition testimony indicated that she was written up for "a task that wasn't completed in an electronic database." Def.'s Stmt. ¶ 3; Ex. 1 at 60:10-18; Ex. 2 at 1. Plaintiff does not further elaborate on the November 2010 threatened reprimand and subsequent written reprimand and the Court will not speculate as to the substance of the reprimand.[14] *See Baloch*, 550 F.3d 1191, 1199 (finding two letters of counseling and an official letter of reprimand insufficient to demonstrate an adverse action where the letter lacked abusive language and contained only job-related criticism); *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir. 2002) (finding preparation and issuance of formal report, without "without additional disciplinary action such as a change in grade, salary, or other benefits" which did not "in any way affect [plaintiff's] job performance ratings or the conditions of her employment" was not an adverse action); *Herbert v. Architect of the Capitol*, 766 F. Supp. 2d 59, 77 (D.D.C. 2011) (written reprimand insufficient for finding of adverse action where reprimand did not contain abusive language or affect the employee's pay, grade, or working conditions). In this case, there is no evidence that the reprimand contained any abusive language as opposed to job-related criticism, nor that it lead to any tangible consequences, and as such, it does not rise to the level of a material adverse action.

Plaintiff's deposition testimony is the only evidence that Plaintiff proffers in support of the effects of her April 10, 2012 leave restriction. *See* Ex. B at 66:2-68:11 (describing the steps she had to take in connection with a leave request, including providing doctor's notes and calling someone to report when she would be absent). Plaintiff does not allege that her medical leave requests were denied, and thus, her allegations about defendant's requests for medical

---

[14] No copy of the written reprimand is included in the record before this Court.

documentation are not adverse actions. "Actionable retaliation claims are limited to those where an employer causes 'material adversity,' not 'trivial harms,'" and the plaintiff must still suffer some objectively tangible harm. *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007); *see generally Aldrich v. Burwell*, 197 F. Supp. 3d 124, 132-33 (D.D.C. 2016) (finding that close scrutiny or monitoring of an employee's whereabouts — without more —does not rise to the level of a materially adverse retaliatory action). Plaintiff does not contend that this leave restriction caused her any objectively tangible harm. Plaintiff does not address the April 25, 2012 reprimand in her Opposition, and accordingly, the Court finds that neither the April 10, 2012 leave restriction nor the April 25, 2012 letter of reprimand constitutes an adverse action.

Inequitable Distribution of Workload and Resources Based on Race

Plaintiff claimed that during the period of October 2012 to December 2012, she experienced an "inequitable distribution of workload, resources, and access to professional development opportunities among the races." Def.'s Stmt. ¶ 47a. The Court has already analyzed this claim in connection with Plaintiff's allegation of discrimination and determined that this claim does not rise to the level of an adverse action because Plaintiff failed to proffer evidence in support of this claim, instead relying solely on her own conclusions. *See Ginger v. District of Columbia*, 527 F.3d 1340, (D.C. Cir. 2008) (affirming summary judgment for the defendant where "[plaintiffs'] allegations of retaliation [were] conclusory, vague, and for the most part unsubstantiated"); *Taylor v. Small*, 350 F.3d 1286, 1296 (D.C. Cir. 2003) (affirming grant of summary judgment in favor of employer where district court found no adverse employment action because plaintiff failed to provide evidence of her alleged change in workload); *Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999 (affirming dismissal on summary judgment where "[plaintiff's] claim of retaliation rest[ed] entirely upon a conclusory

representation" without proffering supporting facts because "[a]ccepting such conclusory allegations as true . . . would defeat the central purpose of the summary judgment device"); *Alford v. Defense Intelligence Agency*, 908 F. Supp. 2d 164, 174 (D.D.C. 2012) (granting summary judgment because "no reasonable jury could conclude from Plaintiff's naked, conclusory allegations of retaliatory motive that Defendant's asserted reasons were in fact pretext for unlawful retaliation"); *Gordon v. Beers*, 972 F. Supp. 2d 28, (D.D.C. 2013) (finding that plaintiff failed to make out *prima facie* case of retaliation because her unsubstantiated conclusory statements "failed to establish the requisite causal nexus between her protected activity" and Defendant's allegedly adverse actions).

Performance Evaluations

Plaintiff alleges that her performance was not properly evaluated. Def.'s Stmt. ¶ 47i. Plaintiff also claims that during the period of February 2013 through August 2013, she "received a low performance evaluation score because of the lack of direction provided to her on future tasks." Def.'s Stmt. ¶ 47c. In this case, the record is completely devoid of any evidence relating to the aforementioned employment evaluations, which are vaguely referenced in Plaintiff's EEOC Charge, and thus, they need not be further addressed by the Court. *See also Walker v. Johnson*, 798 F.3d 1085, 1093-94 (D.C. Cir. 2015) (finding that employee's opinion that her job performance deserved a higher rating was insufficient, by itself, to support inference that her supervisor had a racially discriminatory motive in making her performance evaluation).

Suspensions

Defendant does not specifically address the remaining alleged adverse actions set forth by Plaintiff. The Court notes that two additional alleged adverse actions are mentioned by Plaintiff in her Statement of Countervailing Facts and admitted by the District — Plaintiff received a

three day suspension without pay on March 29, 2013, which was later reduced, and a five day suspension on May 17, 2013, which was later rescinded. Pl.'s Countervailing Facts ¶¶ 163-164, Pl.'s Opp'n, Ex. I (Mar. 8, 2016 Pitts Dep.) at 62:5-63:10; Pl.'s Countervailing Facts ¶¶ 166-167, Ex. I at 65:19-67:12. Where a suspension is proposed but not actually served, courts have been unwilling to find adverse actions. *Baloch*, 550 F. 3d at 1199; *see Whittacker*, 424 F.3d at 647 ("[A] suspension without pay that is never served does not constitute an adverse employment action."). Accordingly, while the five day suspension was rescinded and thus would not constitute an adverse action, there is an issue of fact about whether any part of the three day suspension without pay was served and as such, the Court leaves standing the question as to whether this suspension could constitute a materially adverse action for purposes of Plaintiff's retaliation claims, assuming Plaintiff proffers a connection between her protected activity and this suspension.

c. Investigation and Termination

In this case, the Court finds that the investigation into Plaintiff's alleged filing of a fraudulent IEP, resulting in the subsequent termination of her employment is a materially adverse action. In proceeding on her retaliation claim under Title VII, Plaintiff's protected activity was the filing of five EEO complaints, dated October 11, 2012 through May 20, 2013, with LMER. The EEO complaints were filed against Mr. Gendre and Ms. Dykstra on claims of, *inter alia*, differential treatment, discrimination and retaliation. *See* Pl.'s Opp'n, Ex. N (Pitts April 18, 2016 Dep. Exs.), DC 12- DC 16.

Plaintiff claims that the resulting adverse action was the investigation into her alleged filing of a fraudulent IEP. According to the Plaintiff, during winter break in December 2012 – January 2013, Mr. Gendre and Ms. Dykstra reported the action taken by Plaintiff on December

20, 2012 to "finalize" M.W.'s IEP absent a meeting. Pl.'s Opp'n at 36. This triggered an investigation of Plaintiff's actions by DCPS that commenced in January 2013 and resulted in a March 2013 investigative report that was deemed by DCPS's Office of General Counsel as "insufficient" with "revisions needed." Pl.'s Countervailing Fact ¶ 138; Pl.'s Opp'n, Ex. I (Pitts Dep. Exs.), Ex. 22 (Investigative Report). The final Investigative Report was completed on June 12, 2013, and it was determined to be legally sufficient to support the allegations against Plaintiff. Pl.'s Countervailing Fact ¶¶ 143, 144. On August 8, 2013, Ms. Pitts issued a letter terminating Plaintiff's employment. Def.'s Stmt. ¶ 42.

A review of Plaintiff's Statement of Countervailing Facts relating to the investigation into the allegedly fraudulent IEP indicates that Plaintiff raises genuine issues regarding: (1) the manner in which the investigation was conducted, including but not limited to allegations regarding certain evidence was not considered, and (2) whether the discipline that was imposed on Plaintiff; *i.e.*, termination of employment, was out-of-line with discipline imposed in other cases that were considered by the District. *See* Pl.'s Countervailing Facts ¶¶ 112, 113, 118-121, 130, 131, 139, 140-142, 147, 170-171, 173, 175-178. Consequently, the Court finds the Plaintiff has proffered enough evidence for a reasonable trier of fact to find that she has established a materially adverse action for purposes of proving her *prima facie* case on her claim for retaliation pursuant to Title VII.

### d. Causality

To demonstrate causality in the Title VII context, "traditional principles of but-for causation" apply, and the plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). "The causal connection

component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985). In this case, Ms. Pitts, who served as DCPS's director of Labor Management and Employee Relations from March 2012 to October 2015, and was on the review panel participating in the decision to terminate Plaintiff's employment, was aware of Plaintiff's EEO complaints, and Ms. Dykstra, the Assistant Principal at Shaw, and Mr. Gendre, Shaw's Principal, were also aware of the complaints, as they were named therein. Pl.'s Countervailing Facts ¶¶ 103-104. "[T]emporal proximity between an employee's protected activity and her employer's adverse action is a common and often probative form of evidence of retaliation." *Walker*, 798 F.3d at 1092. "[C]ases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (quotation omitted).

In the instant case, there can be no dispute that temporal proximity establishes causality as Plaintiff filed her EEO complaints with LMER on: October, 2012; December 17, 2012; February 15, 2013; April 10, 2013; and May 20, 2013, and the investigation into the fraudulent IEP, which started in January 2013, resulted in a report in March 2013, which was amended and reissued in June 2013. While the Defendant did not officially terminate Plaintiff's employment until August 2013, that delay was attributable to Defendant and no explanation for the delay was provided. *See* Pl.'s Countervailing Fact ¶ 150. Accordingly, a reasonable trier of fact could conclude that Plaintiff has met her burden of proving a *prima facie* case based on her proffered evidence with regard to her protected activity and the materially adverse action, due to the

temporal proximity between the two.  Defendant does not argue non-retaliatory justification for

its actions, and as such, the Court finds that summary judgment on Plaintiff Title VII retaliation

claim should be denied.

    2. Retaliation under the ADA and the Rehabilitation Act

    Plaintiff seeks to proceed against the District on a claim for retaliation under the

Rehabilitation Act and the ADA.  Section 504 of the Rehabilitation Act provides that:

> No otherwise qualified individual with a disability in the United States . . . shall solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

 Section 504, 29 U.S.C. § 794(a).

    With regard to educational programs, the federal regulations implementing Section 504

require that students who have disabilities be given equal access to public schools and receive a

"free appropriate public education" ("FAPE") without regard to the nature or severity of their

disabilities.  34 C.F.R. § 104.33.  Furthermore, a school district has an affirmative duty to

identify, locate, and evaluate all children with disabilities. 34 C.F.R. §§ 104.32, 104.35.

    The ADA prohibits public entities from excluding qualified individuals with disabilities

from participating in or receiving benefits of "the services, programs, or activities" of that entity.

42 U.S.C. § 12132.  The ADA retaliation provision states that: "No person shall discriminate

against any individual because such individual has opposed any act or practice made unlawful by

this chapter or because such individual made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

Courts frequently interpret the ADA and the Rehabilitation Act the same way. *Alston v. District*

*of Columbia*, 561 F. Supp. 2d 29, 39 (D.D.C. 2008).

Even though Plaintiff is not claiming a disability under either the ADA or Rehabilitation Act, she is entitled to proceed under those statutes under a claim of retaliation. *See Reinhardt v. Albuquerque Pub. Schools Bd. of Educ.*, 595 F.3d 1126 (10th Cir. 2010) (where plaintiff was advocating on behalf of disabled students and brought a claim for retaliation); *Barker v. Riverside Cty. Office of Ed.*, 584 F.3d 821, 826 (9th Cir. 2009) (a plaintiff who is attempting to protect the rights of disabled people has standing to sue for retaliation under the Rehabilitation Act); *Wright v. Compusa, Inc.*, 352 F.3d 472, 477 (1st Cir. 2003) (finding that an ADA plaintiff need not succeed on a disability claim to assert a retaliation claim).

Because the test for retaliation under the ADA and the Rehabilitation Act was originally developed in the context of employment discrimination, the standards articulated in employment discrimination cases apply. *See Alston*, 561 F. Supp. 2d at 40; *Mitchell*, 759 F.2d at 86 (D.C. Cir. 1985). To establish a *prima facie* case of retaliation under either of these statutes requires the plaintiff to show that she (1) engaged in a protected activity; (2) was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. *Hamilton*, 666 F.3d at 1357; *Woodruff*, 482 F.3d at 529; *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C. Cir. 2007). Retaliation claims do not protect an individual "from all retaliation, but from retaliation that produces an injury or harm[.]" *Burlington N.*, 548 U.S. at 67.

a. Protected Activity

For purposes of proceeding with a retaliation claim pursuant to the ADA and Rehabilitation Act, Plaintiff alleges that her advocacy on behalf of her students is the protected activity. Pl.'s Opp'n at 43. Plaintiff makes little, if any, effort however to link her protected activity to a subsequent adverse action. Instead, Plaintiff "respectfully refer(s) the Court to the

detailed listing [in the analysis of her DC WPA claim], and in the accompanying statement of genuine issues and countervailing facts, of the many instances in which Ms. Walker complained about why th[e] lack of resources [was] preventing her from providing a FAPE to her students, as required by the [Individuals with Disabilities in Education Act] IDEA, as well as her other complaints about IEP implementation failures and safety issues at Shaw, and their significant (and disproportionate) impact upon her particularly vulnerable students." *Id.* Plaintiff relies on her own conclusory statements to support her claim that advocacy is a protected activity, without providing specific information as to when and where this advocacy occurred and what kind of alleged adverse actions resulted from engaging in such advocacy.

The Court notes that not all activity a teacher undertakes on behalf of her special education students constitutes protected activity; rather, such activity must go beyond merely assisting special education students which is part of the teacher's job duties. "It is clear from the case law that protected activity does not include mere assistance of special education students, but, rather, requires affirmative action in advocating for, or protesting discrimination related to, unlawful conduct by others." *Montanye v. Wissahickon Sch. Dist.*, 218 F. App'x. 126, 131 (3rd Cir. 2007); *see also Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1132 (10th Cir. 2010) (agreeing with the Ninth and Third Circuits that attempting to protect the rights of special education students is protected activity under the Rehabilitation Act); *Falash v. Inspire Academics, Inc.*, No. 14-cv-00223, 2016 WL 4745171, at *4 (D. Idaho Sept. 12, 2016) (opining that plaintiff's actions to ensure that special education students' needs were being met under their IEPs and logging information to ensure compliance with reporting requirements was not protected activity while advocating on behalf of the students was protected activity).

Because Plaintiff has only provided this Court with vague narratives and conclusory allegations to support her claim that her continuing advocacy is the protected activity under her retaliation claim, and further, that such advocacy is linked to some adverse action, the Court is again placed in the position of having to piece together the elements of Plaintiff's *prima facie* case for her retaliation claim. Accordingly, to try to clarify the type of advocacy that Plaintiff engaged in on behalf of her students, this Court has reviewed the Plaintiff's deposition excerpts that were provided by the Plaintiff as exhibits to her Opposition, which is the only sworn testimony by Plaintiff on record since no affidavit was provided. The Court has also reviewed Plaintiff's Countervailing Facts and cites to any relevant record evidence contained therein. As such, the Court has found the following example of Plaintiff's advocacy that is supported by her sworn testimony, as follows.

Plaintiff testified that many of the students who were transferring had lawyers, and she made recommendations to them regarding her students. Ex. B at 65:5-15. The attorneys were appreciative that she was "open and honest," but she knew she was going to get some "backlash from the administrators." Ex. B at 65:16-22.

At a February 15, 2012 IEP review meeting, she informed the team (included the student's parent and attorney) that a particular student was not receiving an appropriate level of instruction. Pl.'s Countervailing Fact ¶ 3; Ex. A at 105:3-106:10.[15] On March 12, 2012, Shaw Assistant Principal DeMatthews sent a memorandum indicating that:

> From this point forward, special education teachers are not to communicate with attorneys or advocates in any way [ex]cept for scheduling meetings. The purpose of the meeting can and should be stated with attorneys/advocates. However, teachers must not

---

[15] In connection with her Countervailing Fact, Plaintiff cites Pl.'s Opp'n, Ex. J (Feb. 15, 2012 MDT Meeting Notes), wherein it is noted that Plaintiff "expressed that she needs additional resources to accommodate the children in her classroom" and "spoke to the inconsistencies in the behavior supports within the school."

share any new IEP information with the attorney prior to the meeting. Direct all questions, comments or concerns to Ms. Douglas or myself.

Ex. K; *see* Ex. A at 106:10-22.  Notably, this policy applied uniformly to all special education teachers.

Plaintiff testified that at some point after that meeting, during that school year, Shaw Assistant Principal DeMatthews gave Plaintiff low performance evaluation scores, which were inconsistent with prior scores she had received.  Ex. A at 107:1-108:4.  Plaintiff testified that that evaluation did not "change the money at that point" because it was all calculated at the end of the school year based on an average of the scores. Ex. A at 108:5-14.  At the end of the school year, Plaintiff had a "step hold" in her pay.  Ex. A at 108:15-22; Pl.'s Countervailing Fact ¶ 9.

Plaintiff complained further of being "micromanag[ed] by Ms. Douglas" and being questioned about her health by Mr. DeMatthews after she took some sick leave, and then being asked to provide doctor's notes and call Ms. Douglas's cell phone if she was going to take sick leave.  Ex. B at 66:5-68:11; Pl.'s Countervailing Fact ¶ 8.

From the record in this case, the discrete instance of Plaintiff's advocacy on behalf of her students can be characterized as Plaintiff reaching out to the lawyer who represented her disabled student in an effort to facilitate and ensure the student's receipt of services under his IEP.  These actions go beyond the scope of mere assistance to her students, and they put Plaintiff at odds with her employer, DCPS, which is tasked with providing FAPE to students.  As such, Plaintiff's advocacy could be construed as a protected activity for purposes of her retaliation claims under the ADA and the Rehabilitation Act.

b. Adverse Action

To prove her *prima facie* case, Plaintiff next needs to tie this protected activity to a resulting adverse action.  Again, looking at the record in this case, the alleged adverse actions

that followed Plaintiff's protected activity would be the "enhanced" leave policy and micromanagement that Plaintiff was allegedly subjected to by the Shaw administration, which were previously considered by this Court herein and determined not to be adverse actions. That leaves only the issue of Plaintiff's receipt of low evaluation scores from Assistant Principal DeMatthews, "[a]t some point in the year." *See* Ex. A at 107:1-7.

Plaintiff concedes that the low evaluation scores did not have any immediate effect on her. Ex. A at 108:5-14. In general, unsatisfactory performance reviews and written admonishments that contain no abusive language, but rather job-related constructive criticism without tangible consequences, are not actionable. *See Baloch,* 550 F.3d at 1199; *see also Weber v. Battista*, 494 F.3d 179, 185-86 (D.C. Cir. 2007) (evaluations were "adverse actions insofar as they resulted in [plaintiff] losing a financial award or an award of leave because a reasonable jury could conclude that such a loss could well dissuade a reasonable worker from making or supporting a charge of discrimination,") (internal quotation marks and citation omitted); *Brown v Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006) ("A lower score on [the employee's] performance evaluation, by itself, is not actionable . . . unless [the employee] can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities.").

With regard to the low evaluation scores, Plaintiff testified that "it's interesting because if you look at patterns, even going back to McKinley, like it starts off strong and then at some point in the school year where there's some behind the scenes, you know, friction going on for reasons that I'm mentioning, the evaluation scores just like, plummet." Ex. A at 107:1-13. Plaintiff further testified that she had received several prior evaluation scores — two from central office and three from the administrators — and with the two prior scores from Mr. DeMatthews, when

the first one was good and the second one was low, she "[thought] there was some things going on." Ex. A at 107:14-108:4. Plaintiff testified further that the school calculated an average of all scores to see if a teacher met the criteria and she thought she had a "step hold' in her pay at Shaw. Ex. A at 108:8-19. Plaintiff could not recollect whether it was "from the first or second year." Ex. A at 108:15-22.

Plaintiff's testimony is that the low evaluation scores received from Mr. DeMatthews at some point may have led to a step hold at Shaw, but she was uncertain about the dates, and whether it was at Shaw, and if so, during which year. Plaintiff has not demonstrated that the evaluation scores given by Assistant Principal DeMatthews caused a tangible consequence in her circumstances so as to constitute a materially adverse action per the standard set forth in *Burlington N.*, 548 U.S. at 68, *i.e.*, there was an action that would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Furthermore, in terms of tying together Plaintiff's February 15, 2012 advocacy with her allegedly consequent low evaluation scores, which affected her cumulative evaluation scores and later contributed to a step hold in Plaintiff's pay at the end of the school year, there are problems not only with the tenuous nature of the connection between the protected activity and resulting adverse action but also with the proximity of the two. *See Hamilton*, 666 F.3d at 1357-58 (stating the Supreme Court has suggested that "in some instances a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation" but that the Supreme Court has not "established a bright-line three-month rule"); *Clark Cty. Sch. Dist.*, 532 U.S. at 273-74 (An adverse employment action that occurs even three or four months after a protected activity often is not close enough to

suggest a causal connection.).  Accordingly, Plaintiff fails to make a *prima facie* case regarding

her claim for retaliation under the ADA and the Rehabilitation Act.

    **C.  <u>Plaintiff's Whistleblower Claims</u>**

    The DC WPA protects District employees' right to report waste, fraud, abuse of

authority, violations of law, or threats to public health or safety without fear of retaliation or

reprisal.  *See* D.C. Code § 1-615.51, *et seq.* DC WPA claims are analyzed under a burden

shifting analytical framework.  *Payne v. District of Columbia*, 4 F. Supp. 3d 80, 85-86 (D.D.C.

2013).  A plaintiff must demonstrate that he: (1) made a protected disclosure; (2) his supervisor

took or threatened to take a prohibited personnel action against him; and (3) the protected

disclosure was a contributing factor to the retaliation or prohibited personnel action.  *Tabb v.

District of Columbia*, 605 F. Supp. 2d 89, 98 (D.D.C. 2009) (citing *Crawford v. District of

Columbia*, 891 A.2d 216, 218-19 (D.C. 2009).  After the plaintiff demonstrates these three

elements by a preponderance of the evidence, "the burden shifts to the defendant 'to prove by

clear and convincing evidence that the alleged [prohibited personnel] action would have occurred

for legitimate, independent reasons even if the employee had not' made the protected

disclosure."  *Bowyer v. District of Columbia*, 793 F.3d 49, 52 (D.C. Cir. 2015) (citing D.C. Code

§ 1-615.54(b)); *see Winder v. Erste*, 905 F. Supp. 2d 19, 33 (D.D.C. 2012) (discussing burden

shifting in DC WPA cases).  If the defendant carries its burden, the burden shifts back to plaintiff

to show that the explanation was pretext.  *See id.*

    To come within the framework of the DC WPA; the employee must make a "protected

disclosure," which is defined as:

> any disclosure of information, not specifically prohibited by statute, without restriction to
> time, place, form, motive, context, forum, or prior disclosure made to any person by an
> employee . . . including a disclosure made in the ordinary course of an employee's duties
> . . . to a supervisor or a public body that the employee reasonably believes evidences:

(A) Gross mismanagement;

(B) Gross misuse or waste of public resources or funds;

(C) Abuse of authority in connection with the administration of a public program or the execution of a public contract;

(D) A violation of federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or

(E) A substantial and specific danger to the public health and safety.

*See* D.C. Code § 1-615.52(a)(6).

This Circuit has noted that, "in retaliation cases, [ ] whether the employee plaintiff engaged in a protected activity is a 'fact specific inquiry.'" *Williams v. Johnson*, 776 F.3d 865, 870 (D.C. Cir. 2015) (citing *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005). The District of Columbia Court of Appeals has explained that a disclosure is protected under the DC WPA if it reveals "such serious errors by the agency that a conclusion the agency erred is not debatable among reasonable people." *Wilburn v. District of Columbia*, 957 A.2d 921, 925 (2008) (quoting *White v. Dept. of the Air Force*, 391 F.3d 1377, 1382 (Fed. Cir. 2004)). To determine whether an individual possessed a reasonable belief that such errors constituted gross misconduct, abuse, or were illegal, "the proper test is [whether] 'a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee [could] reasonably conclude that the actions of the government evidence [illegality].'" *Zirkle v. District of Columbia*, 830 A.2d 1250, 1259-60 (D.C. 2003) (internal quotation marks omitted) (quoting *LaChance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999).

In its Motion, Defendant argues that Plaintiff's disclosures about, *inter alia*, the schools' failures to provide adequate teaching resources and inadequate working conditions are not

protected disclosures pursuant to subsections (A) and (C) of D.C. Code Section 1-615.52(a)(6), relating to gross mismanagement and abuse of authority. The District argues further that with regard to Plaintiff's disclosures, "the already public nature of the alleged disclosures makes clear that they are not protected disclosures under the DC WPA." Def.'s Mot. at 29; *see* Def.'s Stmt. ¶ 28 ("It was "well known prior to Plaintiff's alleged disclosures that McKinley and Shaw had budgetary constraints and often could not provide its teachers, including its special education teachers, adequate teaching materials and resources.")[16]

Plaintiff indicates however that she is proceeding pursuant to subsections (D) and (E), relating to "violations of law" and "violations of federal law," respectively.[17] Pl.'s Opp'n at 30. Plaintiff notes further that her protected disclosures are not limited to denial of resources needed to maintain an effective special education program but also include D.C.'s failure to implement the students' IEPs, in violation of the IDEA, and safety issues at Shaw. Accordingly, because the District assumed that Plaintiff was proceeding under subsections (A) and (C), with disclosures limited to claims of insufficient "resources," while Plaintiff is actually proceeding under subsections (D) and (E), with disclosures involving a denial of resources that relate to fulfillment of the students' IEPs and the District's compliance with the IDEA, and also to safety issues at Shaw, the vast majority of arguments raised by the District in its Motion are not applicable to Plaintiff's DC WPA claim.

In its Reply, the District characterizes Plaintiff's purported disclosures as <u>advocacy</u> on behalf of her students. Def.'s Reply at 4 (emphasis added). The fact specific question here is whether Plaintiff's disclosures are the kinds of revelations the DC WPA is meant to protect. In

---

[16] This statement was denied by Plaintiff.

[17] Plaintiff's Opposition erroneously refers to subsection (E) as relating to violation of federal law, when (E) pertains to a substantial danger to public health and safety. Pl.'s Opp'n at 30.

this case, it is uncontested by the District that Plaintiff's purported disclosures about non-compliance with the IDEA fit within subsection (D) of the DC WPA. The District does however contest that Plaintiff's "complaints that management tolerated an unsafe school environment at Shaw" rise to the level of protected activity because these complaints "do not involve violations by management of local or federal law." Def.'s Reply at 5. Concerns about school safety issues do not necessarily fall within the "violation of law" or "violation of federal law" section(s) under which Plaintiff is proceeding, and therefore, the issue of whether these are protected disclosures would best be left to a trier of fact to determine. Plaintiff does not however demonstrate any causal link between these alleged protected disclosures and any prohibited personnel action, and thus this claim fails.

In contrast, this Court finds that Plaintiff's complaint about the District's non-compliance with the IDEA fits squarely within the DC WPA. Accordingly, Plaintiff's claims that students were not receiving resources and services compatible with their IEPs and the District was therefore not in compliance with the IDEA are protected disclosures for purposes of the DC WPA

In terms of showing that Plaintiff was subjected to an adverse personnel action, Plaintiff again relies on a veritable laundry list of potential prohibited personnel actions interspersed with extraneous facts that are not material to this issue. These alleged prohibited personnel actions include: (1) her involuntary assignment to Shaw, where she was tasked with a heavy workload; (2) her performance evaluations at the end of the 2011-2012 school year, whereby she received a step hold in her pay after she protested the restrictions on communications with counsel imposed by Assistant Principal DeMatthews; and (3) a false report by Mr. Gendre and Ms. Dykstra that

Ms. Walker had prepared a "fraudulent IEP" that led to the termination of her employment.[18] This Court has already analyzed and rejected the first two of these alleged prohibited personnel actions herein, and the Court has also determined that the investigation into the allegedly fraudulent IEP, which led to Plaintiff's termination has been deemed to qualify as an adverse action.

Accordingly, with regard to Plaintiff's DC WPA claim, the remaining question before this Court is whether the protected disclosure was a contributing factor to the retaliation or prohibited personnel action. While the Plaintiff's protected disclosure admittedly spanned a period of several years, it was not until the period of October 11, 2012 through May 20, 2013, that Plaintiff filed her five EEO grievances with LMER, in which she complained about numerous acts of alleged discrimination and retaliation including the denial of resources that made compliance with her students' IEPs possible. These EEO grievances specifically named Ms. Dykstra and Mr. Gendre, the two people who consequently reported Plaintiff's allegedly fraudulent IEP activity, which triggered a January 2013 investigation that ultimately led to the termination of her employment.

"A plaintiff may show causation through direct evidence or circumstantial evidence, such as by showing that the employer had knowledge of the employee's protected conduct and a close temporal proximity between the employer's knowledge and the adverse actions." *Rattigan*, 503 F. Supp. 2d at 77; *see also Clayton v. District of Columbia*, 931 F. Supp. 2d 192, 203 (D.D.C. 2013) (finding two-month period between employee's protected conduct and adverse action could be sufficient to show temporal causal connection). However, "[a]n inference of

---

[18] Plaintiff also provides unnecessary commentary regarding "pre-meetings" among school staff prior to an IEP meeting without arguing that information about such pre-meetings may be construed as a protected disclosure.

retaliation cannot rest solely on 'temporal proximity' (even it if is established) where the opportunity for retaliation conflicts with the opponent's explicit evidence of an innocent explanation of the event." *Johnson v. District of Columbia*, 935 A.2d 1113, 1120 (D.C. 2007); *compare Nunnally v. District of Columbia*, 243 F. Supp. 3d 55, 71-72 (D.D.C. 2017) (finding that Plaintiff sufficiently showed causation where one to two months passed between Plaintiff's protected disclosures and alleged adverse employment actions and Defendant did not dispute that Plaintiff's supervisors were aware of her complaints, blog entries and letters to elected officials), *with Payne v. District of Columbia Government*, 722 F.3d 345, 354 (D.C. Cir. 2013) (finding that, without additional pertinent evidence, eight month gap between protected activity and alleged retaliation did not constitute "'temporal proximity' that supports a causal connection between the two" and "[t]he fact that one event precedes another does not in itself evidence causation."). With respect to alleged retaliatory acts several months removed from an employee's protected activity, "[the D.C.] Circuit has made it clear that there is a point in time where temporal proximity becomes too remote, without more, to permit an inference of causation," and this analysis can apply similarly to an employee's DC-WPA claims and her claims of retaliation. *Booth v. District of Columbia*, 701 F. Supp. 2d 73, 79, 81 (D.D.C. 2010) (finding that "claims premised on alleged retaliatory actions over four months *after* plaintiffs' protected activity do not permit an inference of causation. . . . [A]bsent additional evidence of causation, which is lacking here, these claims must fail.") (citing *Johnson*, 935 A.2d at 1120).

Here, the Defendants do not dispute that they were aware of the EEO grievances Plaintiff filed with LMER, and the subsequent January 2013 investigation triggered by Ms. Dykstra's and Mr. Gendre's report of Plaintiff's allegedly fraudulent IEP activity occurred approximately three months after the first EEO grievance that Plaintiff filed, and within weeks after the second.

Given the close temporal relationship between the Defendant's knowledge of Plaintiff's protected disclosures and the alleged adverse employment action, the Court finds that Plaintiff has shown sufficient circumstantial evidence to show causation. Plaintiff has met the burden of proof necessary to prove her *prima facie* case, and because Defendant has not attempted to demonstrate that the investigation and termination would have occurred for legitimate, independent reasons even if Plaintiff had not made the protected disclosure, summary judgment should be denied on this claim.

### D. <u>Exhaustion</u>

Defendant asserts that Plaintiff's claims pre-dating August 19, 2011, which are mentioned in Plaintiff's EEOC Charge, which was filed on June 19, 2012 and amended on May 16, 2014, should be barred for Plaintiff's failure to exhaust her administrative remedies. This includes the November 10, 2010 threat to reprimand and the November 23, 2010 written reprimand. The Court does not reach Defendant's administrative exhaustion arguments with respect to Plaintiff's claims pre-dating August 19, 2011. These claims have been dismissed on the merits and accordingly, the Court need not resolve whether they are also appropriately dismissed on the basis of administrative exhaustion, which is an affirmative defense and non-jurisdictional. *Boden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) ("untimely exhaustion of administrative remedies is an affirmative defense"); *Artis v. Bernanke*, 630 F.3d 1031, 1034 (D.C. Cir. 2011) ("Title VII's exhaustion requirements are not jurisdictional").

The District argues that Plaintiff's claim regarding the August 2013 withdrawal of its offer for her to work at Ludlow Elementary School is not actionable since it is not set forth in the May 16, 2014 EEOC Charge. The Court finds the District's argument disingenuous insofar as the District was certainly on notice that Plaintiff, an employee of one D.C. public school who

had an offer of employment from another D.C. public school had her employed terminated by DCPS, and accordingly, withdrawal of the pending employment offer followed.

## IV. CONCLUSION

Accordingly, the Court shall GRANT-IN-PART and DENY-IN-PART Defendant's [54] Motion for Summary Judgment. Specifically, the Court shall grant Defendant's Motion for Summary Judgment with regard to Plaintiff's racial discrimination claim under Title VII and her claim for retaliation under the ADA and the Rehabilitation Act, but shall deny Defendant's Motion for Summary Judgment with regard to Plaintiff's claim under the D.C. Whistleblower Protection Act and for retaliation under Title VII.

An appropriate Order accompanies this Memorandum Opinion.


DATED: September 30, 2017


                                    _____/s/_____
                                    COLLEEN KOLLAR-KOTELLY
                                    UNITED STATES DISTRICT JUDGE